UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHY'KIA NELSON,

    Plaintiff,

v.                                         Case No. 8:21-cv-189-VMC-JSS

KEEP SMILING DENTAL, P.A.,

    Defendant.
_____/

**ORDER**

    This matter comes before the Court upon consideration of
Defendant Keep Smiling Dental, P.A.'s Amended Motion for
Summary Judgment (Doc. # 35), filed on December 1, 2021.
Plaintiff Shy'kia Nelson responded on December 22, 2021 (Doc.
# 41), and Defendant replied on January 5, 2022. (Doc. # 42).
For the reasons that follow, the Motion is granted in part
and denied in part.

**I.    Background**

    Nelson, a Black woman, began working for Keep Smiling as
a dental assistant in 2017. (Doc. # 1 at 1; Doc. # 36-1 at
17:12-13, 18:13-16; Doc. # 38-1 at 19:14-20). Nelson
testified that her supervisors were Tatyana Tserger, the lead
dental assistant, Sherri Tony, the office manager, and Dr.
Laura Habner, the dentist and owner of the practice. (Doc. #

1

36-1 at 25:4-20; Doc. # 36-2 at 2-3; Doc. # 38-1 at 8:24-25, 10:23-25, 16:11-16, 19:14-17, 21:22-22:2).

The working day at Keep Smiling began with a "morning huddle," where Dr. Habner and the dental assistants would discuss which patients were coming in that day and who would see them. (Doc. # 36-1 at 30:5-31:5). Next, the assistants would set up the room for the appropriate procedure and call patients back. (Id. at 31:6-11). As a dental assistant, Nelson would walk the patient back, place their bib, verify their information, have the anesthesia set up if necessary, and then go get the dentist. (Id. at 32:7-24). Dental assistants like Nelson would assist the dentist with procedures by, for example, holding the suction tool, making sure all instruments were clean and ready, and ensuring the patient's comfort. (Id. at 33:15-25). After the procedure was complete, the dental assistants would clean the room and sterilize the instruments. (Id. at 34:1-25).

Nelson testified that, on multiple occasions, she overheard Tserger telling co-workers that the "'stupid black bitch [meaning Nelson] is doing it again' or 'the stupid black bitch has done something wrong.'" (Doc. # 36-1 at 22:5-15). Nelson testified that she heard Tserger use this language on more than five separate occasions and "possibly" on more than

2

ten occasions. (Id. at 22:19-24). This same dental assistant also allegedly made comments to Nelson when she was late that: "I guess black people are always late, huh? That's that colored people time that they talk about." (Id. at 23:10-15). Tserger also allegedly made comments about Nelson's eating habits, telling Nelson "You better stop eating that n----- food. You're going to get too fat." (Id. at 23:15-19).

Nelson stated that she later told Tony and Dr. Habner that she "felt like [Tserger] was racist," but Tony responded that "she was 100 percent sure that [Tserger] was not and so did Dr. Habner." (Id. at 26:13-19). According to Nelson, she was going to report Tserger's "stupid black bitch" comments when they met later to discuss it, as Tony promised, but that meeting never happened. (Id. at 26:20-27:5). According to Nelson, when she approached Dr. Habner and said that her co-worker was racist, Dr. Habner said, "That's ridiculous. T.T. is the sweetest person I know. That can't possibly be happening." (Id. at 27:16-22). Nelson acknowledges that she never reported Tserger's exact comments to Tony or Dr. Habner. (Id. at 26:20-27:5, 27:23-28:2). According to Nelson, she raised her concerns with Tony and Dr. Habner about halfway through her two-year term of employment with Keep Smiling. (Id. at 28:4-10). Dr. Habner testified that she was not aware

3

until this lawsuit was filed that Nelson made complaints about racial discrimination. (Doc. # 38-1 at 48:9-13).

Nelson acknowledged that she and Tserger got into heated arguments at work multiple times. (Doc. # 36-1 at 28:22-24). As Nelson describes it, Tserger would yell at her "[i]f something didn't go right, the day didn't go right, if [Nelson was] running late" or if Nelson "messed something up." (Id. at 1-20). According to Nelson, Tserger would "get in [her] face" and point in her face, and Dr. Habner would also "yell" at her when giving her instructions. (Doc. # 36-1 at 79:1-80:13).

The record reflects that, in August and September 2018, Nelson was given written warnings for being late to work or late returning from her lunch break. (Doc. # 36-2 at 20-21). At the end of February 2019, Nelson authored a note that she gave to Tony, stating:

> I . . . feel like I'm being treated like a child, like I have no voice. I don't appreciate being yelled at and having hands put in my face. I feel like the team is trying to overload me with work. I don't think anyone listens when I ask for things not to be done. I feel like I get yelled at for things I didn't do or I get told to apologize when I get upset but constantly get fingers pointed my way . . . . I been told not to leave on short notice but [Tserger has] done it quite a few times.

(Doc. # 36-2 at 24).

Nelson testified that, on November 5, 2019, Tserger approached her shortly after Nelson clocked in and told her, "We have about five or six dirty rooms, sterilization is a mess, and we have two patients in the lobby." (Doc. # 36-1 at 38:13-39:4). Nelson explained that, the day prior, the schedule had run late, the staff had worked until 7:00 p.m., everyone was "upset" and "really riled" about the late hour, and so Dr. Habner told the staff "don't clean up anything[,] [c]lean it up when you get here in the morning." (Id. at 40:8-24). Nelson stated that it seemed like Tserger was "angry because she came in and everything was still dirty from like the day before." (Id. at 40:2-5).

According to Nelson's testimony, on the morning of November 5, she told Tserger to go ahead and start the morning huddle without her while Nelson started on the sterilization and cleaning duties. (Doc. # 36-1 at 42:18-25). Later, Dr. Habner came into the room and asked Nelson why she was not at the morning huddle. (Id. at 43:1-3). Nelson responded that she was "trying to get everything cleaned up and get the patients back." (Id. at 43:4-9). Nelson acknowledged that, on days she was working, she always attended the morning huddle and she had not informed Tony or Dr. Habner that she was skipping the morning huddle on November 5. (Id. at 43:10-24).

Thereafter, Nelson complied and joined the morning meeting. (Id. at 44:6-10). According to Nelson, once she joined the meeting, Tserger "turns to me and she goes, 'Today better not be like yesterday,' and she's pointing in my face." (Id. at 44:12-15). Nelson responded, "Get [your] finger out of my face. I am not a child." (Id. at 45:4-7). Nelson stated that she cannot remember what Tserger said next, but it made her upset and she "exaggeratedly blew my breath to, pretty much, show my frustration." (Id. at 45:9-12).

As Nelson went to leave the meeting, she claims that Tserger jumped up and said, "I'm not scared of you." (Id. at 45:16-21). Nelson responded, "I wasn't afraid of her either" and tried to push past Tserger, but Tserger wouldn't move. (Id. at 45:19-25). At that point, Nelson testified that Tserger struck her in the face and Nelson returned the punch. (Id. at 46:1-3). Dr. Habner yelled for everyone to stop hitting but "[Tserger] swung at me again so I swung back at her which turned into a little bit of a scuffle where [she] was pulling at me, trying to grab me, and I was trying to grab her." (Id. at 46:5-9). At that point, two other employees came in and dragged the two women apart. (Id. at 46:11-15). Nelson testified that as she was dragged out, she heard

Tserger say, "You stupid black bitch. You deserved it." (Id. at 48:1-6).

Nelson then left the dental office, went to her parents' house, and called the police. (Doc. # 36-1 at 48:22-24). Local law enforcement arrived, interviewed Nelson and Tserger, and filed a report, but did not arrest either woman. (Doc. # 36-2 at 2-8). According to the police report, Tserger told the police that she and Nelson got into a verbal altercation at work, at which time Nelson approached Tserger and began "chest bump[ing]" her. (Id. at 3). Tserger acknowledged that she and Nelson shoved each other, and she claimed that Nelson scratched her arm. (Id.). There is no mention of the alleged "stupid black bitch" comment in the police report. See (Id. at 2-8).

Tserger's written statement to the police differs substantially from Nelson's. Tserger wrote that:

> [Nelson] came into work, upset as usual. I asked her to set up a room while I finish printing charts. I came back 10 min[utes] later, nothing was done, she was cleaning the ultrasonic. I asked why nothing was done, she started arguing. I left. Did the morning huddle by myself. My boss came in and asked why I'm by myself. I told her she's here, I don't know where. She went and got her. [Nelson] came in[,] started arguing, screaming that she's always being blamed and that's why she was cleaning. I told her that I was always respectful and stood up for her, to not scream at me. She wouldn't stop. I stood up, nowhere near her, told

7

her to stop screaming at me. She stood up and
started chest bumping me. I told her 3 times, stop
touching me. She wouldn't and grabbed me, scratched
[me], and then someone came in and separated us.

(Doc. # 36-2 at 7).

Dr. Habner described the November 5 incident like this:

I walked in that morning and there was only
[Tserger]. I said: Where's [Nelson]? So [Tserger]
said: She's back there and I've called her several
times . . . . I said: Let's go get Kia because we're
running out of time. Patients are coming in in 10
minutes. . . .

[Once Dr. Habner goes to retrieve Nelson], I said:
Kia, you just need to sit down. Let's do our morning
huddle. Okay. So then she says: Nobody is listening
to me and she starts yelling at [Tserger].
[Tserger] says: Don't talk to me like that and
stands up. [Nelson] chest bumps my lead assistant
and says: I'm not afraid of you. . . . So [Tserger]
says: "Stop chest bumping me. Stop touching me.

[Nelson] chest bumps her two more times. [Nelson]
lets out a scream. At that moment – there's frosted
glass there. My patient is standing there. I'm
staring at my patient. My patient is staring at me.
. . . And arms start going, scratching and grabbing
starts happening. I immediately separate them and
knock on the wall for help. Help. Help. Help. So
[Tony] runs in and pulls [Nelson] off of [Tserger].

(Doc. # 38-1 at 57:8-59:8).

Dr. Habner testified that, once Nelson "cool[ed] down,"

she came back in, both women apologized, and Nelson quit on

the spot. (Doc. # 38-1 at 61:8-19). Nelson disputes that she

ever quit and maintains that she was fired. (Doc. # 36-1 at

64:12-24; 68:23-69:1, 91:11-14).

Nelson testified that Tony asked her to come in the next day, November 6, 2019, and Nelson did so. (Doc. # 36-1 at 63:15-64:5). She and Tony went into Dr. Habner's office, at which point Tony told Nelson that "there was a unanimous vote the day before" to terminate Nelson's employment. (Id. at 64:7-15). According to Nelson, Dr. Habner walked in and told her that "the reason that I was being let go is because I brought the authorities into it and we could've settled it in house." (Id. at 64:19-24). Dr. Habner denies ever making this statement and claims she did not know who called the police that day. (Doc. # 38-1 at 79:21-80:13).

According to Dr. Habner, Tserger was given a written disciplinary write-up, sent home, and placed on probation following this incident. (Doc. # 38-1 at 60:1-9). Dr. Habner maintains that, despite the November 5 incident, she did not plan to fire Nelson because Nelson and Tserger previously worked well together and this was a "freak thing." (Doc. # 38-1 at 69:20-70:3).

Dr. Habner testified that Tserger no longer works at Keep Smiling, and she could not recall when Tserger left her employment at Keep Smiling or why she did so. (Doc. # 38-1 at 28:9-22).

In Dr. Habner's estimation, Nelson was "not a highly skilled dental assistant." (Doc. # 38-1 at 29:10-11). Dr. Habner never did a written work performance evaluation for Nelson. (Id. at 14:1-23). Dr. Habner said she gave Nelson "[o]ral training daily based on performance" and acknowledged that she disciplined Nelson. (Id. at 35:3-7). According to Dr. Habner, Nelson was "always late. One day she went home for lunch and didn't come back. . . . [T]hat was unacceptable behavior." (Id. at 35:14-19). Nelson was also constantly "on her phone," "always slow," and "los[ing] focus." (Id. at 16:10-13). Despite these issues, Dr. Habner testified that she did not plan to fire Nelson. (Doc. # 38-1 at 44:12-24).

On November 8, 2019, Nelson filed a report with the Florida Department of Financial Services' Division of Workers' Compensation. (Doc. # 36-2 at 9). The claim was related to the November 5 incident, and Nelson claimed that her coworker "hit her in the eye causing injuries to her head." (Id.). Nelson and Keep Smiling later resolved that case, and Nelson received $6,250. (Id. at 10-12).

Nelson initiated this action against Keep Smiling on January 26, 2021, asserting claims for racial discrimination and a racially hostile workplace, in violation of 42 U.S.C. § 1981 (Count One) and retaliation under Section 1981 (Count

10

Two). (Doc. # 1). Keep Smiling filed an answer, and the case proceeded through discovery. Keep Smiling now moves for summary judgment on all claims. (Doc. # 35). The Motion has been fully briefed (Doc. ## 41, 42) and is ripe for review.

## II.   **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at

trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III. **Analysis**

Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts. 42 U.S.C. § 1981(a); Washington v. Kroger Co., 218 F. App'x 822, 824 (11th Cir. 2007). With respect to employment contracts, claims of discrimination under Section 1981 are analyzed under the same framework as discrimination claims under Title VII. Siff v. Audiology Distr., LLC, No. 20-13964, 2022 WL 73758, at *3 (11th Cir. Jan. 7, 2022).

A.   **Racial Discrimination**

Nelson's Complaint is not clear about what theory of racial discrimination she seeks to travel under, although she alleged both a "racially disparate workplace" and a "racially hostile workplace." (Doc. # 1 at ¶¶ 45-46). In her response to the Motion for Summary Judgment, however, she limits her arguments to those centering on a hostile work environment. (Doc. # 41 at 9-12).

The Court agrees with Keep Smiling that the record evidence fails to support the allegation that the lead dental assistant (Tserger) assigned any undesirable jobs or assignments to Nelson due to her race. Thus, Nelson has abandoned any claim for disparate treatment and the record

13

does not support any such claim. See Harrington v. Disney Reg'l Ent., Inc., 276 F. App'x 863, 872 (11th Cir. 2007) (upholding rejection of Section 1981 disparate treatment claim where plaintiffs failed to offer any evidence that similarly-situated white waiters were given better assignments).

Moving on to Nelson's hostile work environment claim,[1] such claims under Section 1981 are established upon proof that "the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harrington, 267 F. App'x at 874 (citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)); see also Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) (noting that Title VII and Section 1981 hostile work environment claims have the same elements and are subject to the same analytical framework).

---

[1] While Keep Smiling argues that Nelson raised a hostile work environment claim for the first time during summary judgment briefing, the Court disagrees. Her complaint alleges that "Defendant's lead dental assistant routinely belittled Plaintiff because of Plaintiff's race" and that Keep Smiling was a "racially hostile work place." (Doc. # 1 at ¶¶ 18, 46).

To establish a hostile work environment claim, a plaintiff must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome racial harassment; (3) that the harassment was based on her race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. Adams v. Austal, USA, LLC, 754 F.3d 1240, 1248–49 (11th Cir. 2014).

The "severe or pervasive" requirement has both objective and subjective components — the employee must subjectively perceive the harassment as severe enough to alter the conditions of employment and this perception must be objectively reasonable. Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). To be objectively reasonable, the behavior must be that which a "reasonable person would find hostile or abusive." Miller, 277 F.3d at 1276. In evaluating the objective severity of the harassment, courts will consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance. Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Here, Nelson can meet the first three prongs of the analysis. Keep Smiling does not dispute that she is Black and thus belongs to a protected group. Viewing the evidence in the light most favorable to Nelson, she has been the subject of unwelcome race-based harassment in the form of racial slurs and comments made by Tserger.

The parties' dispute, instead, centers on the "severe or pervasive" prong. Nelson testified that she reported that Tserger was "racist" to Tony, the office manager, and to Dr. Habner. (Doc. # 36-1 at 26:13-25). Tony allegedly told Nelson that they would discuss it further later, at which point Nelson stated that she was going to tell Tony the precise comments made by Tserger, but that later meeting never happened. (Id. at 26:22-27:5). Given her attempt to report racial harassment to a supervisor, a reasonable jury could conclude that Nelson subjectively perceived her work environment as hostile and abusive.

Further, a reasonable jury could conclude that the harassment was objectively severe or pervasive, that is, Nelson's work environment was one that a reasonable person

16

would find hostile or abusive. Nelson testified that she heard Tserger call her a "stupid black bitch" on more than five occasions and "possibly" on more than 10 occasions over a two-year period. (Doc. # 36-1 at 22:5-24). These were not stray comments. Thus, the conduct was sufficiently frequent. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1304 (11th Cir. 2012) (holding that the plaintiff created a fact question on the pervasiveness of his harassment when he testified to seven racist incidents over a one-year period).

Nelson also testified that Tserger taunted her about being late, saying that was the "colored people time that they talk about." (Doc. # 36-1 at 23:10-15). Most disturbingly, Tserger also allegedly made comments about Nelson's eating habits, telling Nelson "You better stop eating that n----- food. You're going to get too fat." (Id. at 23:15-19).

The Eleventh Circuit has said that "use of the slur 'n-----' is severe," especially when, as here, the slur is (a) used by a supervisor and (b) directed at the plaintiff, not just overheard by the plaintiff. Adams, 754 F.3d at 1255. Indeed, the Eleventh Circuit has held that even a one-time use of the word can constitute severe harassment. See Smelter v. S. Home Care Servs. Inc., 904 F.3d 1276, 1286 (11th Cir.

17

2018) ("Southern Home argues that Smallwood's 'one-time use' of ['n-----'] was insufficient to establish severity as a matter of law. We strongly disagree."). Tserger's use of such "uniquely offensive and racist language," especially when viewed in light of her other comments about Nelson being a "stupid black bitch" or "colored time," qualifies as severe harassment.

Similarly, the third objectivity factor can be met if the conduct is "physically threatening *or* humiliating." Mendoza, 195 F.3d at 1246. A reasonable person could conclude that Tserger intended for her slurs to humiliate Nelson and a reasonable person could find it humiliating to be called a "n-----" or a "stupid black bitch" or teased about operating on "colored time" by a supervisor.

Finally, the fourth factor – interference with job performance – does not weigh in Nelson's favor as she testified that she tried to brush off these comments and get on with her work duties. (Doc. # 36-1 at 26:7-12).

"No single factor is required" to establish the objective component. Harris, 510 U.S. at 23. Instead, the court is to judge the totality of the circumstances. Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010). Viewed under that lens, the Court finds that the

18

cumulative evidence presented by Nelson is sufficient to allow a reasonable person to find that the harassment she experienced was severe or pervasive enough to create an abusive working environment.

That does leave, however, the fifth prong of the hostile work environment analysis: whether Keep Smiling is responsible for such environment under either a theory of vicarious or of direct liability. Neither party briefed this issue.

An employer "is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate . . . authority over the employee." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). The employer will be strictly liable for the hostile work environment if the supervisor takes tangible employment action against the victim. Id. "A tangible employment action constitutes a significant change in employment status," such as firing the employee. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

On the other hand, when the harassment does not culminate in a tangible employment action, a defending employer "may raise an affirmative defense to liability." Id. at 765. The defense has two necessary elements: "(a) that the employer

19

exercised reasonable care to prevent and correct promptly any
. . . harassing behavior, and (b) that the plaintiff employee
unreasonably failed to take advantage of any preventive or
corrective opportunities provided by the employer or to avoid
harm otherwise." <u>Miller</u>, 277 F.3d at 1278. Both elements must
be satisfied for the defendant employer to avoid liability
and the defendant bears the burden of proof on each. <u>Moreland-
Richardson v. City of Snellville</u>, No. 19-14228, 2021 WL
4452523, at *9 (11th Cir. Sept. 29, 2021)

Where the perpetrator of the harassment is merely a co-
employee of the victim, the employer will be held directly
liable if it knew or should have known of the harassing
conduct but failed to take prompt remedial action. <u>Miller</u>,
277 F.3d at 1278. Thus, a victim of coworker harassment must
show either actual knowledge on the part of the employer or
conduct sufficiently severe and pervasive as to constitute
constructive knowledge to the employer. <u>Id.</u>

Here, both Nelson and Dr. Habner testified that Nelson
"reported" to Tserger as the lead dental assistant and that
Tserger could assign work duties to Nelson, although Tserger
did not have the power to hire or fire Nelson or determine
her pay rate. (Doc. # 36-1 at 25:7-24; Doc. # 38-1 at 21:16-

24, 24:10-25). A reasonable jury could conclude that Tserger was a supervisor with direct authority over Nelson.

It is undisputed that Tserger herself did not take any tangible employment actions against Nelson – Nelson either quit or was fired by Dr. Habner. That raises the issue of whether Keep Smiling can avail itself of the Faragher-Ellerth defense. But Keep Smiling bears the burden of demonstrating both prongs of the defense, which it has made no effort to do. While Keep Smiling may be able to put on sufficient proof at trial on this affirmative defense, it has not done so at this stage.

To the Court's mind, there is also a question of fact as to whether Tserger's role was closer to that of a co-employee with Nelson and, if that is the case, whether the employer had actual or constructive knowledge of the harassment. Given Nelson's testimony that she attempted to report Tserger's behavior to Tony and Dr. Habner and her testimony regarding the multitude of times that Tserger used racial slurs about her, there is a genuine issue of material fact on these points.

In sum, for the reasons explained above, a reasonable jury could conclude that Nelson was subjected to a hostile work environment. Defendant's Motion with respect to any

claim Nelson may have made for disparate treatment is granted, but the Motion is denied with respect to Nelson's hostile work environment claim.

### B.   Retaliation

In Count Two, Nelson asserts a claim for retaliation under Section 1981. The Supreme Court has found that Section 1981 encompasses claims of retaliation. See CBOCS W., Inc. v. Humphries, 553 U.S. 442, 446 (2008). A claim for retaliation under Section 1981 requires a plaintiff to demonstrate that: (1) she engaged in protected activity; (2) defendant subsequently took an adverse employment action against her; and (3) the adverse employment action was causally related to the protected activity. Cisero v. Wal-Mart, Inc., No. 3:05-cv-1105-TJC-MCR, 2007 WL 1877674, at *1 (M.D. Fla. Jan. 29, 2007).

In her complaint, Nelson alleged that she "contacted the local police department to complain of racial discrimination and a racially motivated assault" by Tserger. (Doc. # 1 at ¶ 57). She further alleged that she was fired because she complained about racial discrimination. (Id. at ¶ 62). According to Nelson, "[b]ut for [her] complaint to the local police about racial discrimination and a racially motivated

assault, Defendant would not have terminated [her] employment." (Id. at ¶ 63).

Keep Smiling argues that Nelson's retaliation claim fails for two reasons. First, because neither the police report nor Nelson's written statement to police mentions harassment or derogatory comments of a racial nature, this was not a "protected" complaint of race discrimination. (Doc. # 35 at 15-17). Second, even if the Court were to construe the police report as protected activity, there is no evidence that the decisionmaker, Dr. Habner, was ever aware of the protected nature of the police report because, again, the police report is devoid of any race-based complaints. (Id. at 17-19). These arguments are well taken.

Nelson does not dispute that the police report is devoid of any mention that the alleged assault by Tserger was racially motivated or that Tserger made racially derogatory comments to her. And, indeed, the Court's review of the police report supports this conclusion. (Doc. # 37-1 at 2-8). While Nelson testified that she told the police officer about Tserger's "black bitch" comment, there's no indication in the record that the police officer ever mentioned that comment to Dr. Habner. See (Id.). Nelson testified that Dr. Habner told her on November 6, 2019, that she was being fired "because

[she] brought the authorities into it," but there is no evidence that Dr. Habner knew of any race-based nature of the police report.

In short, the Court agrees with Keep Smiling that Nelson has failed to show either that she engaged in protected expression or any causal connection between her alleged protected activity of contacting the police and/or filing the police report and her termination. See Toines v. Whole Foods Mkt. Grp., Inc., No. 1:08-cv-3370-RLV-JFK, 2009 WL 10699236, at *8 (N.D. Ga. July 10, 2009), report and recommendation adopted, 2009 WL 10699356 (N.D. Ga. Aug. 5, 2009) (dismissing retaliation claim where plaintiff's letter to management complaining of poor treatment did not present any race-based complaints and "[b]ecause plaintiff's letter did not alert [Defendant] that he was protesting an unlawful employment action, he cannot establish that he engaged in statutorily protected expression"); see also Coutu v. Martin Cty. Bd. of Cty. Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995) (noting that the plaintiff "made no allegation and offered no proof of race or national origin discrimination; she contended only that she worked hard and deserved a better rating than [her supervisor] had given her"); Turner v. Barber-Scotia Coll., 604 F. Supp. 1450, 1458-59 (M.D. N.C. 1985) (although

24

plaintiffs opposed defendant's employment practices, because plaintiffs did not establish that the opposition was in response to racial policies, "it was not the type of protected activity contemplated within a Title VII . . . retaliation claim").

There being no genuine issue of material fact on this point, Keep Smiling is entitled to summary judgment on Count Two. See Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) (explaining that in order to satisfy the "causal link" prong of a retaliation claim, a plaintiff must, at a minimum, establish that the defendant was actually aware of the protected expression at the time the defendant took adverse employment action).

**IV.   Conclusion**

For the reasons previously explained, Keep Smiling's Motion for Summary Judgment is granted as to Count Two and as to the disparate treatment portion of Count One. The Motion is denied as to the hostile work environment claim in Count One. The case will proceed to trial on that claim alone.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Keep Smiling Dental, P.A.'s Amended Motion for Summary Judgment (Doc. # 35) is **GRANTED in part and DENIED in part** as set forth herein.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 17th day of February, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE